THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JOHN BUCANIS, DEFENDANT-APPELLANT.

Argued December 2, 1957—Decided February 3, 1958.

*Mr. Irving Lloyd Gang* argued the cause for appellant.

*Mr. Archibald Kreiger,* Deputy Attorney-General, argued the cause for respondent (*Mr. Charles S. Joelson,* Deputy Attorney-General, attorney).

The opinion of the court was delivered by
WACHENFELD, J. Defendant appeals from a conviction of second-degree murder resulting in a State Prison sentence of 25 to 30 years.

■ On the early morning of February 24, 1955 the defendant shot his wife Antoinette while she was standing next to the driver's side of a parked car in front of a tavern at 145 Third Street, Passaic, New Jersey. He was seated behind the wheel of his own car, about 18 feet away, on the opposite side of the street. The bullet penetrated her upper right arm, shattering the bone, and proceeded through the right lung, striking one of the vertebrae and returning to the lung.

After the shooting the defendant picked up his wife and took her to the Passaic General Hospital. She died shortly after arrival. Following his arrest at the hospital, he cooperated fully with the police, obtained the gun used in the shooting from the back of his car, and made a voluntary statement in which he admitted raising the gun to "scare" his wife but maintained that its firing was purely accidental.

Antoinette Bucanis had been married once before and had left her then husband, who was in military service, to take up with another man. The parties involved here met in 1943. Antoinette at first did not disclose that she was already married, and in 1944 they began living together as husband and wife, resulting in a child being born. After Antoinette's husband had obtained a divorce in early 1947, John and she were married. Between 1947 and 1949 the defendant was confined to the New Jersey State Prison, and approximately a year after his imprisonment had begun his wife gave birth to another man's child which she put out for adoption.

When John was released he worked to support his wife and child, but her growing appetite for alcohol prevented the establishment of any normal relationship or home life. Two other children were born, making three in all.

Antoinette exhibited a woeful lack of care for her children, which added to the matrimonial discord and is stressed as relating to the unfortunate culmination of the marriage. We have no desire to catalogue exhaustively her extensive and sordid deficiencies as a mother. Several examples will suffice to reflect the dismal picture.

In December of 1954 the defendant left his wife with their small son to do some shopping, and while he was away the four-year-old boy was struck by an automobile as his mother sat in a tavern drinking with a male companion.

On Christmas Eve Antoinette Bucanis failed to come home and the defendant eventually found her in the apartment of this same drinking companion.

On four different occasions fires started in the Bucanis apartment while the children were alone and Antoinette was in a bar. The last of these occurred on January 9, 1955, when John was in the hospital. Two of the children were seriously burned and as a result Mrs. Bucanis was committed to the Passaic County Jail for 30 days on a charge of neglect.

The defendant was much interested in hunting and fishing, in which he indulged to a considerable extent, and his equipment for these purposes included a .22 calibre rifle. The fire described above destroyed the plastic trigger guard on this rifle, and defendant returned the gun to his automobile where it had customarily been kept.

On the evening of February 23, 1955 the defendant and his wife removed their youngest son from the hospital where he had been undergoing plastic surgery for his burns. Antoinette remained in a tavern while Bucanis took the boy to her sister's home. After about an hour, the defendant rejoined his wife and shortly thereafter she left. He eventually went looking for her and found her in another tavern. The two of them went home together.

Antoinette, however, objected to retiring, saying that it was too early, and a quarrel ensued during which the defendant slapped her and tried to prevent her from leaving by threatening to telephone her sister. Nevertheless, Mrs. Bucanis left the apartment. Defendant made some sandwiches for his lunch the next day, placed them in his car, and drove off in search of his wife.

He went to a tavern at 127 Third Street and parked nearby. He then went to Kupay's Tavern around the corner and double-parked next to an open space at the curb too

small to accommodate his car. Defendant saw his wife approach across the sidewalk to his right. She walked in front of him, between the parked cars, and continued diagonally across the street toward Kupay's Tavern. She stopped and became engaged in conversation with one Anna Macejka who was parked in front of the tavern. The defendant called to his wife and said either "If you don't come in this car, I will shoot you," or "If you go in that tavern, I will shoot you." She ignored him and continued talking to Mrs. Macejka. He reached back, took the .22 calibre rifle from the rear seat of his car and placed the muzzle in the open window beside him. He contends that as he did so the heel of his right hand near the base of his little finger, or the base of that finger itself, struck the unguarded trigger causing the rifle to accidentally discharge.

The State's case consisted of defendant's admissions plus the natural and logical inferences it insisted should be drawn from them. It produced Mrs. Macejka, who had witnessed the events immediately preceding the shot, and from the nature of the wound, the point of entrance, the short distance separating the victim and the defendant at the time the shot was fired, and from all of the other circumstances, including the pronouncement by the defendant that "If you don't come in this car, I will shoot you," the State contended the shooting was willful, deliberate and premeditated; that the defendant knew the gun was loaded; that he had aimed it at the victim and deliberately fired it with intent to take her life.

It is alleged there was reversible error in the admission of a photograph which is asserted to be cumulative, gruesome and inflammatory; in permitting the State to maintain that the course of the bullet was evidential of the defendant's intent; and in allowing improper utterances and remarks by the prosecutor which tended to prejudice the jury.

During the trial Dr. Surgent, the Passaic County Medical Examiner, testified as to the findings of an autopsy and identified photographs showing the entrance wound on the outer surface of the arm, the exit wound on the inner sur-

face of the arm and the entrance wound in the chest. He said the post mortem examination of the inside of the chest showed that the bullet had entered between the sixth and seventh ribs and had proceeded through the lower lobe of the right lung to the sixth dorsal vertebra, which it struck, rebounding into the pleural cavity. He identified the remains of the bullet and traced its course generally, saying that it had followed a straight line throughout.

For the most part, the photographs which the State offered in evidence purported to show the course of the fatal bullet in the deceased's body: S–12, wound in outer arm; S–13, wound in surface of inner arm and wound in surface of chest; S–14, wound in surface of outer arm; S–15, wound in surface of outer arm; and S–16, wound in surface of inner arm. Another photograph, S–21, was admitted depicting the deceased in the morgue prior to the autopsy.

S–26, the photograph objected to, was taken after the autopsy had been performed. The view is from a low level and close to the body. It shows a portion of the right hip, all of the torso, the right arm and the head of the deceased. Appellant accurately describes the subject: "Incisions had beed made allowing the flesh to be retracted to expose the abdominal organs and the inner structure of the chest. In the picture the examiner's knife lies on the exposed portion of the abdomen, a sponge and other instruments are on the table in the immediate foreground and in the corner of the table beside the subject lie organs which have been removed. The subject's head appears to have been supported and the left eye is partly open."

Following this vivid portrayal, the appellant asserts: "Without further elaboration it is sufficient to say that the total effect is gruesome and horrifying," and one need only look at the photograph to be in accord with this conclusion. ■ He frankly concedes, however, that under our previous decisions such a photograph may be admitted despite its inflammatory nature if it is probative of some material fact,

citing *State v. Heathcoat,* 119 *N. J. L.* 33 (*E. & A.* 1937); *State v. Burrell,* 112 *N. J. L.* 330 (*E. & A.* 1933); *State v. Fine,* 110 *N. J. L.* 67 (*E. & A.* 1932); *State v. Aeschbach,* 107 *N. J. L.* 433 (*E. & A.* 1931); and *State v. Fiore,* 94 *N. J. L.* 477 (*E. & A.* 1920). Appellant urges, however, that S–26 had little or no evidential significance and that none of the cases enumerated above sanctioned the admission of gruesome photographs which are of negligble value as proof.

He suggests that "since the present case may be one of new impression" we adopt the California rule excluding horrifying photographs when the fact which they tend to prove is undenied or their predominant effect is to arouse the emotions of the jury without contributing enlightenment on the issues at hand. *People v. Redston,* 139 *Cal. App.* 2d 485, 293 *P.* 2d 880 (*Dist. Ct. App.* 1956).

Our more recent decisions involving the question *sub judice* have held, in substance, that admission is mainly, if not entirely, within the discretion of the trial judge whose decision will not be overturned save for marked abuse.

In *State v. Myers,* 7 *N. J.* 465 (1951), photographs of the corpse "after it was found more than two weeks after the drowning" were offered and objected to upon the ground that they would inflame and prejudice the jury, and we held, following *State v. Fine, supra,* and *State v. Heathcoat, supra,* that even though the photographs were cumulative they were nevertheless admissible.

In *State v. Huff,* 14 *N. J.* 240 (1954), four photographs were introduced into evidence showing the body of the deceased in a grave and shortly after it had been removed therefrom. Two of these were in color and their admission was challenged upon the basis that they were "secondary, unnecessary, irrelevant and incompetent" and were "gruesome" and "horrified and sickened those inspecting the photographs." We held: "Photographs of unpleasant and gruesome aspects of a murder case are not objectionable for this reason alone, and their admission has frequently been sustained," citing many of the cases already mentioned.

For the first time we approved the use of color photographs, saying there was no logical reason why they should not be admitted into evidence subject to the same limitations and restrictions already placed upon black and white photographs.

In *State v. Wise,* 19 *N. J.* 59 (1955), numerous photographs were objected to upon the ground that they were cumulative and irrelevant and because they had a tendency to inflame and arouse the emotions of the jury. In sustaining the verdict there, we held: "This question is mainly, if not entirely, within the discretion of the trial court, and its decision will not ordinarily be disturbed unless there is a marked abuse of discretion."

These cases contained broad pronouncements which, perhaps, gave too much encouragement to the thought that the prosecution could use at will any and all pictures at a murder trial as long as they possessed some relevancy. Each decision, however, presumed, of course, that the trial judge would continue to exercise a modicum of sound judicial discretion and exclude any picture that was unusually gruesome or repulsive and had little evidential value, admitting only those which would be of significant assistance to the jury in its deliberations as to the guilt or innocence of the defendant and which were not unduly prejudicial.

The fact that a photograph may have some probative force is not always completely determinative of its admissibility. There are cases where the logical relevance of such an exhibit will unquestionably be overwhelmed by its inherently prejudicial qualities which will impair the defendant's right to a fair and impartial trial. When undoubtedly the minute peg of relevancy will be entirely obscured by the quantity of dirty linen hung upon it, fair play directs the exclusion of the exhibit. *State v. Goebel,* 36 *Wash. 2d* 367, 218 *P. 2d* 300 (*Sup. Ct.* 1950). Whether evidence is admissible depends upon a composite of factors, and its relevance may on occasion be overbalanced by more weighty considerations militating for exclusion. *McCormick, Evidence,* 319–20 (1954).

The picture under discussion here was gruesome and horrifying. It portrayed the disemboweled body of the victim after an autopsy and was repulsive beyond description. Although it was probative to a degree, it was nevertheless more harmful than illuminating. Sound judicial discretion dictated its exclusion.

Should, then, the conviction be reversed because of the admission of this one gruesome photograph? The answer turns upon whether or not the appellant has been substantially prejudiced within the contemplation of our plain error rule. *R. R.* 1:5–1. If he is to obtain relief, it must be under the plain error rule because his objection to the admission of the photograph was insufficient to raise an issue as to its inflammatory and prejudicial qualities. He objected solely upon the basis that Dr. Surgent had already testified to the facts which the photograph purported to demonstrate.

Although there is ample evidence in the record to support a conviction of first-degree murder, the jury returned a verdict of second-degree murder, which was favorable under the proven circumstances. Admittedly, he had become disgusted with and embittered toward his wife as a result of her sordid behavior. His oral warning indicated the malice he entertained. He was skilled in the use of a rifle and was but 18 feet away from the target when he admittedly fired a shot which entered between the sixth and seventh ribs of the body of the victim. The jury discredited his version that he did not intend to shoot his wife and had intended to fire over her head to frighten her. No one knew better than he the natural consequences of the use of a deadly weapon.

 The adjudications are abundant that a homicide with a deadly weapon in itself justifies a factual presumption that there was an intention to take life. *State v. Jones,* 115 *N. J. L.* 257 (*E. & A.* 1935); *State v. Maioni,* 78 *N. J. L.* 339 (*E. & A.* 1909). The weapon used and the manner and circumstances of the killing may support an inference of deliberation and premeditation. *State v. Peter-*

*son,* 10 *N. J.* 155 (1952); *State v. Pierce,* 4 *N. J.* 252 (1950).

Probably because of the wife's moral deterioration and her weakness for constant alcoholic debauches, the jury gave the defendant the benefit of every doubt.

Although the trial judge charged the jury concerning voluntary manslaughter, it was not even suggested by the testimony that the killing took place in a transport of passion or hot blood upon reasonable provocation. In fact, the cool warning, "I told her if she didn't come into the car I would shoot her," speaks convincingly and devastatingly to the contrary.

From a meticulous examination of the record in light of the verdict rendered, we conclude the questioned exhibit did not cause the defendant to suffer manifest wrong or injury requiring a reversal within the meaning of the terms of our plain error rule as we have construed it.

█ Next, it is set forth that the State was erroneously allowed to contend that the path of the bullet in the body of the deceased was evidence that the rifle had been aimed and that the shooting was intentional.

There is no contention that a particular portion of the testimony was improperly received, and admittedly the issue was not even raised at the trial, but the defendant now insists: "* * * it was gross error to permit the State to leap from the inadequately proven fact of trajectory to the conclusion of aim, which was not established by any other evidence whatsoever."

The medical testimony was ample to show that the bullet had traveled in a horizontal plane from the time it left the rifle until it struck the victim. The short distance between the rifle and the victim, the bullet's course, its point of entrance and general direction from there on were all material and relevant to show intent.

Whether the relationship between these facts and the intended conclusion was tenuous or convincing, they were nevertheless a proper part of the State's thesis and their weight was for the jury.

Finally, appellant contends that during the course of the trial and in his summation the prosecuting attorney made numerous untoward comments and statements with the clear purpose of inflaming and prejudicing the jury. It is said this conduct was inimical to the standards of fundamental fair play delineated in the decisions of this court and thus requires a reversal.

We have frequently condemned any action by a prosecutor which does not comport with the ethical obligation of his office to see that justice is done. As a representative of the sovereign, it is his difficult duty to protect innocence by promoting the interest of truth and at the same time to insure that the felon receives the punishment society has decreed.

But we must not be so idealistic as to close our eyes to the realities of human nature as they are continually portrayed during our trial process. Each criminal trial is a swiftly moving dramatic contest which often evokes strong emotions in the participants. The charged atmosphere created frequently makes it arduous for the prosecuting attorney to stay within the orbit of strict propriety.

We have necessarily held, therefore, that not every suspected deviation from perfection on the part of a prosecutor will justify a reversal of a conviction. Before such a result ensues, his infraction must be clear and unmistakable and must substantially prejudice the defendant's fundamental right to have the jury fairly evaluate the merits of his defense.

Generally, a prosecutor is limited to commenting upon the evidence and the reasonable inferences to be drawn therefrom. *State v. Bogen,* 13 *N. J.* 137 (1953). But this rule does not preclude a vigorous and forceful presentation of the State's case, which may be couched in trenchant terms, and, as was stated in *State v. Vaszorich,* 13 *N. J.* 99, 119 (1953), "every excursion outside the evidence will not necessarily vitiate a conviction and * * * on the question whether the improper comment shall have that effect, the

making by trial counsel of a timely and proper objection and the action of the trial judge in connection therewith are ordinarily controlling considerations."

The importance of prompt action by trial counsel in challenging unjustified remarks was also emphasized in *State v. Bogen, supra,* 13 *N. J.* at *pages* 141–42, where this court stated that "[o]rdinarily a defendant will not be heard to claim prejudice if defense counsel does not interpose a timely and proper objection to the improper remarks," citing *State v. Hauptmann,* 115 *N. J. L.* 412 (*E. & A.*), *cert.* den. 296 *U. S.* 649, 56 *S. Ct.* 310, 80 *L. Ed.* 461 (1935), and *State v. Terry,* 91 *N. J. L.* 539 (*E. & A.* 1918).

A timely objection provides the trial court with an opportunity to rectify the situation or to reduce the impact of such comment by taking corrective action. In many cases what prejudice there is can be eliminated in this manner. In most instances, under our system of jurisprudence, the onus is upon the lawyer to safeguard his client from such conduct through means available in the trial court. Defense counsel is not ordinarily free to scrutinize the record at his later leisure and to secure reversals upon the basis of what he thus discerns as error, unless it definitely comes within the scope of our plain error rule as we have interpreted it.

One of the male jurors voluntarily revealed in an off-hand manner during his *voir dire* interrogation that he had been in the service. Appellant complains that the prosecutor made improper appeals to him and to other members of the jury who might have been ex-servicemen by several times referring to matters of military usage in the handling of firearms and by using a phrase, "Dear John letter," which has a particular connotation to ex-servicemen.

Also challenged is the prosecutor's comment, during the course of a colloquy between opposing counsel, that "I don't want anybody pointing a gun at me"; the prosecutor's reference during summation to defendant's keeping a crucifix in a box of "junk" in the back of his car; and the prosecutor's statement that Antoinette Bucanis had come

"back from the grave" through the autopsy photograph to prove that her husband had aimed his rifle at her.

Additionally, Bucanis claims that during summation the prosecutor attempted to have the jury substitute its special knowledge for evidence rejected by the court. This assertion relates to the prosecutor's contention that there were ejection marks on two bullets found in the back of Bucanis' car. He asked the jury, if they disbelieved this, to have "one of the gentlemen who knows guns" put some bullets in the murder weapon and then eject them so that the marks could be compared with those on the two shells in question. Appellant urges this was prejudicial error since testimony by Officer Waksmundzki to the existence of the ejection marks had been excluded "because the witness was not qualified."

The record discloses, however, that Waksmundzki was permitted to testify freely that there were ejection marks on the heads of the bullets. When he attempted to identify markings on the shell casings, however, as being those which result "when it pulls back," his statement was excluded as a mere "conclusion." His general qualifications to categorize the markings were not questioned, and, contrary to appellant's argument, the prosecuting attorney did not tell the jury to rely upon the ex-servicemen's opinion as to the origin of the marks. Instead, he asked the whole jury to compare the results of the experiment which he had suggested with the condition of the two bullets in controversy.

In the last paragraph of his charge, the trial judge strongly admonished the jury that: "You will approach your deliberations without bias, passion, prejudice or sympathy. You must decide the issues solely upon the evidence as you honestly believe the evidence to be and let your verdict be in accord with the evidence."

After examining all of the challenged remarks in their trial setting and full context and taking into consideration the failure of defendant's attorney in almost every instance to note an objection, plus the trial judge's emphatic closing direction that the issues should be decided solely on the evidence, we conclude that a reversal is not warranted on

the ground of the prosecutor's alleged misconduct. We do not think there was any transgression sufficient to justify our resorting to the plain error rule.

The conviction below is affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices WACHENFELD, BURLING, JACOBS, FRANCIS and PROCTOR—6.

*For reversal*—Justice HEHER—1.