**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2859-15T3

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

OSCAR DEJESUS, a/k/a
OSCA DEJESUS,

     Defendant-Appellant.

_____

Argued May 31, 2018 – Decided October 5, 2018

Before Judges Alvarez and Geiger.

On appeal from Superior Court of New Jersey, Law Division, Cape May County, Indictment No. 14-11-0951.

Elizabeth C. Jarit, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Elizabeth C. Jarit, of counsel and on the briefs).

Gretchen A. Pickering, Assistant Prosecutor, argued the cause for respondent (Jeffrey H. Sutherland, Cape May County Prosecutor, attorney; Gretchen A. Pickering

and Julie H. Mazur, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Tried by a jury, defendant Oscar DeJesus was convicted of first-degree robbery, N.J.S.A. 2C:15-1(a).[1] After denying his motion for a new trial, the trial judge sentenced defendant on January 29, 2016, to a sixteen-year state prison term subject to eighty-five percent parole ineligibility. See N.J.S.A. 2C:43-7.2(a). Defendant appeals his conviction. We reverse and remand for a new trial.

## I.

At approximately 8:50 p.m. on September 5, 2014, a man wearing a bandana or do-rag completely covering his hair and a handkerchief around his neck, went to the counter at a Family Dollar store. He asked an employee, Tiffany Tomsich, about the cost of a pack of cigarettes. After she responded, she said the man "put his hands in his pockets like he's going to get money and then he brings his hand up underneath his shirt and says he's going to make it easy, just give me all your money." Tomsich asked Leticia Grant, a co-worker, to open the register. When Grant questioned Tomsich about the request, the

---

[1] The State moved for the dismissal of a first-degree conspiracy charge, N.J.S.A. 2C:15-1(a) and N.J.S.A. 2C:5-2(a)(1), prior to the commencement of trial.

man interjected: "it was for him to have the money." He lifted up his shirt, and showed the women the handle of a gun.

While Grant was opening the register, the robber told her to hurry because he had "someone waiting" for him. After he was given the money from the register drawer, he asked for the larger bills. Tomsich explained that she could not override the time delay in the safe where they were kept. The man then grabbed the rolls of change out of the drawer and left. Tomsich and Grant locked the doors to the store, ran to the rear, and Tomsich called police. Middle Township Police Officer Leonard Larkin arrived first.

Tomsich described the suspect as approximately her height, five foot seven, and "either light-skinned [African-American] or Puerto Rican," or "maybe mixed." Grant said the suspect was "maybe five four, five," skinny, and either Hispanic or a "light-skinned [African-American] male."

Police investigators obtained the surveillance video from a department store located to the east of the Family Dollar. At 8:18 p.m., the video depicts a man wearing black pants, a black t-shirt, and black shoes with white soles who is heading towards the Family Dollar. He is seen walking away from the store at 8:22 p.m. About five minutes later, a white work van with a rear window and a ladder rack drives past the parking lot; none of the vehicle's occupants could be seen in the video.

At 8:47 p.m., a person wearing black pants, a black hooded long-sleeve shirt, and black shoes with white soles, is seen on tape heading towards the store. Most of the person's head, the back of his neck, lower chin and throat are covered. Moments later, a white van with a ladder rack is seen driving down the street. The person jogs away from the store at 8:53 p.m., and a white van drives past at 8:56.

Middle Township Police Department Detective Kenneth Martin testified that the man wearing a short-sleeve shirt was similar in height to the person identified as the suspect. Both wore black pants, similar sneakers, and walked in a similar fashion. Martin said that the first person on the video was not considered a suspect, however, because of differences in his appearance from defendant.

When Middle Township Corporal Gino Castellano canvased the area for eyewitnesses, he recalled that a few weeks prior he had stopped a white work van with ladder racks. Christopher Tracy, a Caucasian, was the driver, and defendant, who is Hispanic, was his passenger. Castellano informed Martin about the stop.

Martin retrieved the incident report, and entered the van's license plate into an automatic license plate reader. Hours before the robbery the van had been driven near the Family Dollar store twice.

A-2859-15T3

The van was eventually located in the parking lot of a retail establishment. Tracy consented to a search, but officers found nothing of evidential value. Although defendant had been in the area all day, he denied being involved in the robbery.

After meeting defendant, Martin created a photo array that included defendant's picture. Middle Township Police Detective Giacomo Trombetta was assigned to show the photo array to the employees because he was unfamiliar with the investigation.

Martin and Trombetta went to Grant's house, where Trombetta displayed the array to Grant while Martin "tried to corral" Grant's child. Grant covered up the hair and neck on each photo in order to focus on the area of the face "from the nose and above up to the lower end of the forehead." Grant testified that she chose the second photo of the array, but she did not sign the picture on the back.

Martin asked Grant if the picture depicted the person who committed the robbery. He also asked if she was "a little thrown off" because of the hair, and whether "everything else looked like him." Grant said that it did, and Martin responded with "okay. Sounds good." Grant said she was seventy-five percent certain of her identification.

The officers presented the array to Tomsich while she was working at the store. She too chose the second photo, defendant's picture, and was not asked

5

to sign the back. She said she was "unsure at first" of her choice because the person in the photo had "poofy" hair, while the robber's head was covered. Her level of certainty was an "eight or nine out of ten." Trombetta sound recorded both identifications.

At trial, the prosecutor showed defendant's photograph, taken from the array, to the employees, and they confirmed that it was the photo they had selected of the robber. The prosecutor also showed them defendant's arrest photo, and they agreed that it depicted the robber, and that his appearance in that photo was the same as his appearance when he robbed the store.

After the second employee's testimony, the prosecutor stated, "[l]et the record reflect that the witness, on the stand, has in-court identified [defendant's arrest photo] as the person that robbed" the store.

Grant testified that during the incident she "blacked out," meaning her mind kept "leaving and want[ed] to get out of there," which was "worse" than having a panic attack. She also testified that she pulled a customer who was in the store to the back with her and Tomsich. Tomsich did not recall anyone else being present at the time. When he arrived, Larkin did not see anyone other than the two employees. We describe additional portions of the trial testimony, counsel's objections, and the court's charge in the relevant sections of the opinion.

On appeal, defendant raises the following points:

POINT I
THE DEFENDANT'S RIGHTS TO CONFRONTATION AND DUE PROCESS WERE REPEATEDLY VIOLATED BY THE ADMISSION OF OUT-OF-COURT STATEMENTS MADE BY A NON-TESTIFYING WITNESS, AND BY ADDITIONAL TESTIMONY FROM THE OFFICERS THAT THEY HAD BEEN PROVIDED WITH INFORMATION LINKING THE ROBBER TO THE VAN.

POINT II
THE POLICE OFFICERS GAVE THEIR OPINION ABOUT THE KEY ISSUES RELATING TO THE DEFENDANT'S GUILT, SUPERSEDING THE ROLE OF THE JURY AND DENYING DEJESUS DUE PROCESS AND A FAIR TRIAL.

POINT III
PROSECUTORIAL MISCONDUCT PERMEATED BOTH THE TRIAL TESTIMONY AND SUMMATION, DENYING DEFENDANT DUE PROCESS AND A FAIR TRIAL.

A.    The prosecutor highlighted the "seriousness" of the offense, stoking fear in the jury.

B.    The prosecutor asked questions in order to arouse sympathy for the victims, and urged the jury to give the victims the credibility that they "deserve".

C.    The prosecutor elicited testimony, and repeated during summations, that the prior motor vehicle stop involving DeJesus was because of "suspicious" behavior.

A-2859-15T3

D.     The prosecutor implied that "guilty beyond a reasonable doubt" was the equivalent of 75% probability, and falsely stated that the witnesses had "no doubt" that the defendant was the robber.

E.     The prosecutor argued that the defendant purposefully tried to deceive the jury by changing his appearance.

F.     The prosecutor urged the jury to "do your job" and return a guilty verdict, while getting into defendant's personal space and pointing at him.

POINT IV
THE IMPROPER ADMISSION OF THE WITNESSES' ON-THE-STAND "IDENTIFICATIONS" USING THE DEFENDANT'S ARREST PHOTO AND THE OMISSION OF RELEVANT SYSTEM VARI[]ABLES FROM THE JURY INSTRUCTION DENIED DEJESUS DUE PROCESS AND A FAIR TRIAL.  (Not Raised Below).

POINT V
AFTER THE JURY SENT OUT A NOTE THAT THEY WERE 11 TO 1 AND COULD NOT REACH A CONSENSUS, THE JUDGE'S INSTRUCTION DISCUSSING THE LENGTH OF THE TRIAL AND THAT A SUBSTANTIAL AMOUNT OF EVIDENCE HAD BEEN PRESENTED WAS COERCIVE AND INTRUDED UPON THE JURY'S DELIBERATIVE FUNCTION.

POINT VI
THE CUMULATIVE IMPACT OF THE ERRORS DENIED DEJESUS DUE PROCESS AND A FAIR TRIAL.  (Not Raised Below).

<u>POINT VII</u>
RESENTENCING IS REQUIRED BECAUSE THE PROSECUTOR URGED THE JUDGE TO CONSIDER ALLEGED EVIDENCE OF GUILT NOT ADMITTED AT TRIAL AND BECAUSE THE COURT IMPROPERLY CONSIDERED THE DEFENDANT'S FAILURE TO ADMIT GUILT IN AGGRAVATION.

A.    Because the prosecutor urged the judge to consider supposed evidence, not admitted at trial, of the defendant's guilt in imposing a sentence, resentencing is required to ensure that this extraneous information did not impact the court's sentencing determination.

B.    Consideration of the defendant's failure to admit guilt in finding aggravating factor three violated DeJesus' rights under the Fifth Amendment and state privilege against self-incrimination.

## II.

When error is not brought to the attention of the trial court, we will not reverse unless the appellant shows "plain error"—error "clearly capable of producing an unjust result." <u>R.</u> 2:10-2.  If the error was objected to or otherwise brought to the attention of the trial court, the same standard ultimately applies notwithstanding it being called "harmful error."  It must be error clearly capable of producing an unjust result.  <u>State v. Castagna</u>, 187 N.J. 293, 312 (2006) (stating that the court "will disregard any error or omission by the trial court unless it is of such a nature as to have been clearly capable of producing an

9

unjust result.") (internal citations and quotations omitted). If the error is harmless, it will be disregarded by the court. State v. Macon, 57 N.J. 325, 333 (1971) ("except in extraordinary circumstances, a claim of error will not be entertained unless it is perfectly clear that there was actually was error").

The prospect of an unjust result must be "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." Id. at 336. Even an error of constitutional dimension will not be considered harmful unless it contributed to the verdict. State v. Gillespie, 208 N.J. 59, 93 (2011) (finding that admission of other crimes was harmless because of the independent overwhelming evidence of guilt); State v. Slobodian, 57 N.J. 18, 23 (1970). The burden is on the State to prove by a reasonable doubt that the error did not contribute to the verdict. State v. Cabbell, 207 N.J. 311, 338 (2011).

### III.

Defendant contends that the State "elicited testimony that the officers had concluded that 1) the white van was involved in the robbery, 2) [defendant] matched the description of the suspect provided by [Grant and Tomsich], 3) [defendant's] appearance at the time of trial was different than his arrest photo, and 4) the police had probable cause that [defendant] committed the crime." Some of this information came from a non-testifying witness. Defendant

maintains that as a result, defendant "was denied his right to due process and a fair trial, requiring reversal."

At trial, the prosecutor asked Sweitzer to recount his interviews of the victims at the scene, to which defense counsel objected. After the court sustained the objection, the prosecutor continued with his questioning. This time the officer named Brandon Kane, an eyewitness who could not be located before trial:

> Q. Okay. Now, what else did you learn while you were there?
>
> A. More of what the -- the victim?
>
> Q. Yeah.
>
> A. Um --
>
> Q. Not -- not what the victim said.
>
> A. Okay.
>
> Q. You were just talking about what Fiori had told you; what else did you learn?
>
> A. Okay. Mr. -- Sergeant Fiori stated that a -- Brandon came –

Defense counsel again objected. The prosecutor continued:

> Q. Did you -- did you learn anything else before you left that area?
>
> A. Yes, I did.

Q.     And what did you learn?

A.     I learned that a possible suspect ran by a possible -- a witness, matching the description of the suspect that was involved with the investigation at Family Dollar. That suspect ran by the witness on Hirst Avenue, which is east of Family Dollar.  Get into a passenger side -- passenger side of a white work van, with ladder racks.

Defense counsel objected a third time, but the trial judge ruled the testimony was admissible in order to clarify the reason the officers had continued to investigate.  The prosecutor proceeded:

Q.     Now, Detective, before leaving the Family Dollar that evening, did you develop some information about a white van in the area?

A.     Yes, I did.

Q.     And a white van with a -- was there anything different about that white van?

A.     That white van had -- was a work van, Ford work van.  It had windows on the back and then on the passenger side, with ladder racks.  And the first two characters were X8.

Later, the prosecutor elicited a statement from Sweitzer as follows:

Q.     There is another area that is marked on that map S-7, and it's 206 Hirst Avenue.  Can you explain to the ladies and gentlemen of the jury why that is marked, and how that became part of this investigation?

A.     Okay.  When I was provided information from a possible witness of what had occurred, that he

12

> witnessed the suspect get into this white van -- can I get up and --
>
> Q. Yeah, get up and show that. And focus in on -- think you talked about a white van, focus in on the white van.
>
> A. The witness this -- sorry. The witness I spoke to stated he was traveling down Hirst Ave., when a suspect matching the description of the Family Dollar ran by him; he got into a white van in the area. At that time --

Defense counsel immediately objected, pointing out that the missing witness was the source for the partial license plate. Outside the presence of the jury, the judge instructed the officer to not give hearsay testimony.

Nonetheless, the prosecutor posed the following question to Sweitzer, who repeated the information supplied by Kane, without attribution:

> Q. And can you explain to the ladies and gentlemen of the jury, why this particular photograph [of the van] has any relevance to this investigation, if anything at all?
>
> A. From the information that I've gathered, this vehicle was seen in the area.

Sweitzer later explained that his attention was drawn to the white van seen on the video because of "information that was provided."

The court gave the jury the following instruction with regard to that testimony:

A-2859-15T3

So right now I'm going to give you a limiting instruction regarding some statements made by the last witness, Detective Sweitzer.

While Detective Sweitzer was testifying you heard him make statements describing what another person told him. Specifically, Detective Sweitzer testified regarding statements by an unidentified person regarding the white van and some other information that you heard.

I have to rule -- I have already ruled that is not evidence in this case. In other words, what the other person told Detective Sweitzer is not evidence.

So I have to just order you to disregard that particular testimony. I know sometimes once you hear something it's hard to forget it, but I have to tell you that that's not evidence, it cannot be considered by you. When you ultimately deliberate on this case it should play no part whatsoever in your deliberations.

Can everybody follow that instruction?

Let the record reflect everybody has answered yes.

Castellano also testified. He said that after speaking to "some people," and "information" that he received on the scene, he remembered the motor vehicle stop of the white van. The court denied defendant's motion for a mistrial, made the following day, based on the officers' references to Kane and the information he gave them.

Defendant now argues that the curative instruction was insufficient. He alleges it was not inclusive, not "firm, clear, and accomplished without delay." State v. Vallejo, 198 N.J. 122, 134 (2009). He further contends that by the time the instruction was given, the jury could not have identified which testimony they were being told to ignore.

A detailed discussion of State v. Branch, 182 N.J. 338 (2005) is warranted. In Branch, "[t]he State's case rested primarily" on the identification of two eyewitnesses to a burglary. Id. at 346-47. In that case, the victims' description of the burglar significantly varied in terms of height, complexion, age, and facial hair from defendant's appearance at the time of the crime. Id. at 345. The witnesses selected defendant's photograph from an array that included men with facial hair even though they had described the burglar as having either no facial hair or light facial hair. Ibid.

In Branch, the defendant alleged that the detective's testimony violated the Bankston principles in that the detective said more than just that he acted "based on information received." The State responded that the explanation was necessary in order for the jury to understand the detective "did not proceed with the photographic identification in an arbitrary manner." Branch, 182 N.J. at 347. The Court, relying in part on State v. Bankston, 63 N.J. 263 (1973), reversed the conviction. The Court stated:

A-2859-15T3

> Both the hearsay rule and the right of confrontation protect a defendant from the incriminating statements of a faceless accuser who remains in the shadows and avoids the light of court. There was no legitimate need or reason for [the detective] to tell the jury why he placed defendant's picture in the photographic array. The only relevant evidence was the identification itself.
>
> [Id. at 348.]

The Court held the hearsay testimony violated defendant's federal and state rights to confrontation as well as the rules of evidence. "[A] police officer may not imply to the jury that he possessed the superior knowledge, outside the record, that incriminates the defendant." Id. at 351. The crucial evidence was "whether the officer fairly arranged and displayed the photographic array and whether the witness made a reliable identification." Id. at 352.

In violation of the principles enunciated in Branch, here, the jury was told that Kane was the source of the information regarding the presence of the white van in the vicinity at the approximate time of the crime and the partial license plate number. Because of Kane's statement, about which the jury was told, Castellano connected the van in the video with his prior stop of a similar vehicle in the area. That vehicle had a passenger who in some respects was similar to the description of the assailant in this case. Thus the jury heard information from a faceless witness placing the van at the scene, which they then heard the police connected to the van on the video, and the van's passenger to defendant.

16                                                                  A-2859-15T3

The testimony violated the principles enunciated in <u>Bankston</u> and <u>Branch</u>. The testimony was also hearsay and not admissible under any exception to the hearsay rule. The references to the information provided by Kane should have been excluded, were not, and were clearly prejudicial to defendant. While the judge's instruction was tailored to the improper testimony by Sweitzer, it did not address Castellano. In any event, it could not have ameliorated the prejudicial effect of important information, relied on by police, coming from an uncalled witness. The State's case hinged on that first piece of information, which was inadmissible hearsay.

IV.

A police officer testifying as a lay witness may only relate fact testimony, "set[ting] forth what he or she perceived through one or more of the senses." <u>State v. McLean</u>, 205 N.J. 438, 460 (2011); N.J.R.E. 701. "Fact testimony has always consisted of a description of what the officer did and saw," but "includes no opinion, lay or expert, and does not convey information about what the officer 'believed,' 'thought,' or 'suspected,' but instead is an ordinary fact-based recitation by a witness with first-hand knowledge." <u>McLean</u>, 205 N.J. at 460.

Only when an officer is properly qualified as an expert may he "explain the implications of observed behaviors that would otherwise fall outside the understanding of ordinary people on the jury." <u>Id.</u> at 460. Even experts,

however, may not "opine directly about a defendant's guilt or innocence" and should "refrain from mimicking the precise language of a statute, to the extent possible, to avoid offering legal conclusions." State v. Sowell, 213 N.J. 89, 103 (2013). The risk of undue prejudice as a consequence of improper opinion testimony "could be significant if the expert witness is one of the investigating officers and also offers an opinion on the ultimate issue in the case. McLean, 205 N.J. at 454 (citation omitted).

On this point, defendant refers to the following portions of the record regarding the identification of the van:

> Q. Looking at those photos based on your investigation, is there any relationship, or anything relevant about these photos?
>
> A. Yes, it -- yes, there is.
>
> Q. Explain to the ladies and gentlemen of the jury what the relevance is?
>
> A. Okay. The bottom right still photo, the time is 8:47, approximately 8:47. Right after that video, or that shot is taken -- let me see time-wise. Right before that -- that time the suspect enters -- or walks by the surveillance video at Aaron's, which is also at 8:47. At the top left is a surveill -- I'm -- okay. Yes, so the top left is at 8:53 is the suspect leaving the area of Family Dollar. And the photograph to the top right is at, again, another photograph from Hirst Ave. at 8:56.

Q. So based on the information you had gathered, and from your training and experience as an officer, did you -- did you come to any ideas or conclusions?

A. Yes, I did.

Q. And what was that?

A. That this vehicle was involved in an investigation.

. . . .

Q. I'm going to ask you this. Based on the time signatures and what you had learned on the spot, did this white van become at least a vehicle that was of interest to you as a law enforcement officer?

A. At that time, yes it did.

Defendant's attorney objected to the testimony that the white van was connected with the crime, which objection was overruled.

The officers also opined that the description of the suspect matched defendant's appearance. Both Sweitzer and Martin were asked if defendant became a suspect based on the victims' description. Sweitzer answered a direct question on the subject in the affirmative. Martin explained he included defendant in the photo arrays because defendant "match[ed]" the description of the suspect.

As the Court has ruled, an officer's testimony cannot include an "opinion, lay or expert" and must not "convey information about what the officer

'believed,' 'thought' or 'suspected . . . .'" State v. McLean, 205 N.J. 438, 460 (2011). The officers' testimony, to which defense counsel unsuccessfully objected, falls within the prohibition of State v. Lazo, 209 N.J. 9 (2012).

In Lazo, the Supreme Court reversed a conviction based on a police detective's testimony that a defendant "closely resembled" a composite sketch of a suspect made pursuant to a criminal investigation. Id. at 24. The Court held that his "testimony had no independent relevance, it merely served to bolster the victim's account." Ibid. The problem with such testimony is that it corroborates a civilian witness's identification with support from an official, when the officer himself did not perceive the identifying characteristics of the actor. Ibid. Sweitzer and Martin's reasons for including defendant's photo in the array were both irrelevant and highly prejudicial. Id. at 15.

Here, where the eyewitnesses to the crime could only identify the suspect solely from around the eye area because his head and the lower part of his face were covered, the potential for prejudice is heightened. In this case, the connection between defendant and the crime was attenuated, and the identification based on a relatively minimal viewing of a portion of the man's face.

Additionally, the officers testified that defendant's appearance differed at trial from the time of his arrest. Martin said that his hair was "braided as

20

opposed to being loose here in these photographs. His eyebrows appear to be trimmed, and he has some -- it looks like he has -- he's clean shaven here and he may have some facial hair today." This opinion added a gloss to the victim's description. The jury itself could determine if defendant's appearance differed from the photographs taken at the time of his arrest, from the photo included in the array, and from the victim's description.

Martin opined that he did not arrest defendant until such time as he had "probable cause[,]" and defined the term as meaning "51 percent." He went on to explain that after the victims had made their identifications, the police had probable cause to make an arrest. This testimony was also unnecessary and improper. Although stating that he believed he had probable cause for arrest was not, strictly speaking, an opinion on the ultimate issue, it could have certainly been heard by the jury as such an opinion.

The officers testified to more than facts. They were asked to express their beliefs and thoughts. The risk of undue prejudice from this testimony is substantial. See McLean, 205 N.J. at 454.

V.

Prosecutorial misconduct will not be grounds "for reversal of a criminal conviction unless the conduct [is] so egregious that it deprived the defendant of a fair trial." State v. Ramseur, 106 N.J. 123, 322 (1987). The prosecutor's

21

conduct must have been unquestionably improper, and must have significantly prejudiced defendant's right to have a jury evaluate the merits of his defense. State v. Timmendequas, 161 N.J. 515, 575 (1999).

In determining whether a prosecutor's misconduct is sufficiently egregious, a court must look at 1) whether defense counsel made proper and timely objections to the improper remarks; 2) whether the remarks were withdrawn; and 3) whether the court ordered that the remarks be stricken from the record and instructed the jury to disregard them. State v. Frost, 158 N.J. 76, 83 (1999). In this case, defendant's argument is anchored in the prosecutor's questioning of the witnesses, not just closing remarks.

The objected-to testimony includes the prosecutor asking Sweitzer, "on a scale of zero to ten in terms of police seriousness, where would this rank in your experience and training?" The officer responded that since they did not know if the suspect was in the area carrying a weapon, he considered this matter quite serious, "probably I would say a ten." Ibid. Another officer was also asked to "rate" the seriousness of this incident, and said that the matter was "anywhere from an eight to a ten." This testimony was irrelevant and prejudicial.

Furthermore, the prosecutor asked Grant questions intended to highlight the emotional consequences of the robbery. During her testimony, the prosecutor asked if she had children, to which she responded "[s]ix." The

prosecutor then asked, "[d]id that thought pop into your head when he said he was going to pop you?" Grant responded affirmatively. The following exchange occurred:

Q: Now, you did say you "blacked out", I mean, you didn't black out and go on the ground, right?

A: Right.

Q: And it wasn't completely black?

A: Right. It was just in my head, I was – I just see my kids at – at moments, then I would come back and would just see my kids again.

Q: And why were you seeing the kids at that moment?

A: I didn't think I was going to make it out of there. And they . . . were the only things I could think about.

The prosecutor also asked her whether she ever told her children about the robbery, to which she responded in the negative. Grant said she no longer worked in retail because the event was so traumatic.

Defendant argues that the prosecutor in closing impermissibly focused on the virtues of the victims and the emotional toll of the trial itself. The prosecutor said, for example, that Grant was "brave [to] come here and tell [the jury] her story of the terrorization that those two women went through at [defendant's] hands." The prosecutor also said: "it's an ID case built around these two women,

one who told you that they love their job and couldn't do it again, who told you we still have not told our children."  He added:

> I'm going to ask you to give them the credibility and the believability that they deserve because they went through something that nobody should have to go through.  Nobody who is working at ten of 9 [sic] with six kids, for one, and three at home, should through that for $150 -- $200. That's what they did.  And they told you he did it.

Defense counsel did not object to these questions or to the comments made in summation.  Although some of the testimony was no doubt appropriate in that the employees, to satisfy the statute, arguably needed to describe the effect of the robbery, additional details were irrelevant, and designed to do nothing more than present them in a sympathetic light.  Questioning intended to elicit sympathy has no place in a fair trial.  See State v. Rivera, 437 N.J. Super. 434, 463 (App. Div. 2014).

## VI.

Defendant also contends that Castellano made reference, to his detriment, to defendant being involved in an earlier suspicious stop in an analogous argument to the claim prior bad acts were improperly introduced.  See N.J.R.E. 404(b).  The prosecutor said in summation that the white van was "initially stopped for suspicious behavior, they were let go, the defendant was a passenger in it."  In addition to his argument that the characterization was prejudicial and

24

improper, defendant also contends it was in direct conflict with a pretrial stipulation that the jury would be informed of the prior stop, but told that they should not "consider such contact with the police as prejudicing [defendant] in any way."

The questioning complied with that stipulation—Castellano was not asked for the reasons for the stop nor did the prosecutor suggest it was attributable to any wrongdoing on the part of defendant. Castellano, however, when asked if he was "involved in a motor vehicle stop of what type of vehicle?" replied, "[I]t was a suspicious vehicle." The prosecutor referred to it in closing in that manner. But the references were fleeting, and it was clear that defendant was not charged with anything as a result of the stop. It was unlikely to have prejudiced the outcome. See R. 2:10-2.

## VII.

"Generally, a prosecutor is limited to commenting upon the evidence and the reasonable inferences to be drawn therefrom." State v. Bucanis, 26 N.J. 45, 56 (1958). However, this rule does not preclude the prosecutor from making a vigorous and forceful presentation of the State's case, possibly couched in "trenchant terms." Ibid. "[E]very excursion outside the evidence will not necessarily vitiate a conviction and [ ] on the question whether the improper comment shall have that effect, the making by trial counsel of a timely and

proper objection and the action of the trial judge in connection therewith are ordinarily controlling considerations." State v. Vaszorich, 13 N.J. 99, 119 (1953).

"[N]ot every suspected deviation from perfection on the part of a prosecutor will justify a reversal of a conviction." Bucanis, 26 N.J. at 56. Before there is a reversal, the infraction must be clear and unmistakable. Ibid. The prosecutor's conduct must have been so clearly and unmistakably improper and substantially prejudiced defendant's right to have a jury fairly evaluate the merits of his defense. State v. Smith, 167 N.J. 158, 181-82 (2001). If defense counsel does not object to the prosecutor's remarks, the "remarks will not be deemed prejudicial" as "[t]he failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made." Frost, 158 N.J. at 83-84.

Defendant contends that some of the prosecutor's comments, such as about the meaning of guilt beyond a reasonable doubt was improper. He also commented upon the changes in defendant's appearance from the time of arrest to the time of trial, specifically, that defendant's hairstyle was different, he had grown facial hair, and that his eyebrows were different. Defendant asserts that the prosecutor suggested that defendant changed his appearance in an attempt to

26

deceive the jury. Standing alone the statements may have been fair comment on the evidence. Standing alone they may have been harmless error.

It is improper for the prosecution to accuse the defendant of conspiring with his counsel to "conceal and distort the truth" or deceive the jury. State v. Darrian, 255 N.J. Super. 435, 457 (App. Div. 1992). Similarly, the prosecutor should not "argue that defense counsel was misdirecting the jury from the truth and trying to 'trip up' honest witnesses." Ibid.; see also State v. Sherman, 230 N.J. Super. 10, 16 (App. Div. 1988). However, it is "not improper for the prosecutor to comment on the credibility of the defendant." Darrian, 255 N.J. Super. at 458. When placed side by side with other problematic statements, however, they may have affected the fairness of the process.

With regard to reasonable doubt, the prosecutor said:

> Confidence and accuracy. [Seventy-five] percent. Doesn't sound great, but remember what beyond a reasonable doubt is. More likely than not is [fifty-one] percent. Absolute certainty is 100 percent. Nowadays, my kids get grades of 110. I don't know how you do that, but they get 110. I thought 100 percent was the most you can go. [Seventy-five] percent is within that range, but there's a qualification there.
>
> If Ms. Grant said, I was 100 percent certain, but I didn't see his hair, how credible is that? And they each said: the hair threw me off. I've got to factor that in. They did hand manipulation, everything, to try to adjust for the hair. And what did Detective Martin say? I was

> stuck with that photo and I had to adjust for the hair. So I submit to you that her [seventy-five] percent is 100 percent based on what she saw, and she saw this. She saw this. This close.

A review of the context in which these statements were made, however, makes clear that the discussion was not about reasonable doubt, but rather the witness's identification of defendant. See Frost, 158 N.J. at 85.

The prosecutor urged the jury to "do [its] job[,]" coming dangerously close to a call to action, or asking the jury to protect society, or asking them to send a message to those who commit crimes. "Warnings to a jury about not doing its job is considered to be among the most egregious forms of prosecutor misconduct." State v. Acker, 265 N.J. Super. 351, 356-57 (App. Div. 1993) (finding that the prosecutor's argument that it was the function of the jury to protect young victims of alleged sexual offenses was improper); see also State v. Rose, 112 N.J. 454, 521 (1988); State v. Knight, 63 N.J. 187 (1973); State v. Plowden, 126 N.J. Super. 228 (App. Div. 1974) ("We do not approve of the argument that it's the jury's job to protect society). A call to action was both unnecessary and has no place in a fair trial.

## VIII.

We agree with defendant that Martin gave Grant positive feedback. The judge should have included the feedback factor in the Henderson jury instruction

she gave.  State v. Henderson, 208 N.J. 208 (2011).  This would have safeguarded the jury's assessment of the identifications.  In the event of a retrial, the court should consider charging the jury as to all of the pertinent Henderson factors, including feedback and systems variables.  See Model Jury Charges (Criminal), "Identification:  In-Court and Out-of-Court Identifications" (effective Sept. 4, 2012).

It bears noting that the court did conduct a Henderson hearing before trial, and found the out-of-court identifications to be reliable.  The court did not find any feedback as required by the case.  Martin did, however, ask where the victim had previously seen the person chosen from the array—but he improperly went on to ask Grant if the person she identified was "the person who committed the robbery," thus providing confirming feedback.  He also probed a difference between the quantity of hair in the photograph included in the photo array as opposed to that which she described at the time of the robbery.  After Grant explained the difference between hairstyles, Martin said "sounds good."

IX.

This is one of those rare cases in which, even if none of the points defendant raises was prejudicial error necessitating a new trial, certainly the cumulative effect requires it.  See State v. Orecchio, 16 N.J. 125, 129 (1954).

We do not reach defendant's other arguments; they are made moot by this decision.

Reversed and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2859-15T3