SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**State v. Gabriel Garcia** (A-47-19) (083568)

**Argued November 9, 2020 -- Decided March 10, 2021**

**ALBIN, J., writing for the Court.**

The Court considers, under the plain error doctrine, whether the exclusion of a cell phone video depicting defendant Gabriel Garcia's family members attempting to give their account to the police at the scene of defendant's arrest and the prosecutor's summation remarks, directly at odds with the video, denied defendant a fair trial.

Defendant was charged with second-degree aggravated assault and related charges stemming from a bloody confrontation with Raymond Urbanski outside of defendant's mother's house in September 2016. During a four-day jury trial, the State and defense presented starkly different accounts of the events in dispute.

According to Urbanski and his wife, they were outside around 1:00 a.m. when defendant parked two houses away and began "blasting" his horn. Urbanski gestured for defendant to "keep it down," and walked toward defendant's car. Defendant then exited his car with a box cutter in hand and, after a physical struggle, slashed Urbanski's face and finger. Urbanksi's wife called the police. Detective Janixza Domenech and other police officers responded. Domenech spoke with Urbanski and took a formal statement from his wife. Domenech stated she canvassed the area for witnesses but found none. She stated that, to her knowledge, no other witnesses came forward.

In contrast, defendant testified that, after parking outside his mother's house and honking his horn three times, Urbanski approached his vehicle and banged on his car roof. When defendant exited the car, Urbanski, armed with a bottle, along with two other armed men, chased defendant. After being punched by Urbanski, defendant pulled a box cutter, used for work, from his belt. Defendant was struck in the head with a bottle; defendant flung his hand in fear and slashed Urbanski's face.

Meanwhile, defendant's mother, stepfather, and sister gathered on the mother's porch. Their testimony of the events they witnessed paralleled defendant's. They each testified that they attempted to speak with police at the scene but that "they just wouldn't listen." During cross-examination, the prosecutor elicited the same basic responses from

1

defendant's family members -- they spoke to defense counsel and each other before testifying and hoped their testimony would help defendant.

During trial, defense counsel sought to admit a video, taken by defendant's uncle, capturing the family's interaction with the police at the scene. The video portrayed the family attempting to give their account to the police and being told to "take it to court," with Domenech walking in the background. The trial court excluded the video as inadmissible hearsay, rejecting the argument that the video contained prior consistent statements admissible to meet a charge of recent fabrication under N.J.R.E. 803(a)(2).

The prosecutor's summation targeted the credibility of defendant's family members, specifically the mother's, urging the jury to disbelieve their testimony because they did not come forward and give their accounts to police at the scene. The prosecutor also intimated that it was preposterous to think that the police would not take information from an available witness.

Defendant was convicted of all charges. The Appellate Division affirmed the convictions. The Court granted certification, limited to the issues of whether "the exclusion of the cell phone video" and the prosecutor's summation remarks denied defendant a fair trial. 241 N.J. 15 (2020).

**HELD:** The trial court erroneously kept admissible evidence from the jury. The video rebutted what the prosecutor implied during cross-examination -- that defendant's witnesses lied about their attempt to speak with the police at the scene. That video also contradicted the investigating detective's testimony that she had thoroughly canvassed the area for witnesses. In summation, the prosecutor exploited the suppression of the video to present a false narrative and improperly suggested to the jury that the defense witnesses made no effort to give their accounts to the officers at the scene. The combination of the trial court's erroneous evidentiary ruling and the prosecutor's inappropriate remarks during summation had the clear capacity to cause an unjust result.

1. The video recording constituted extrinsic evidence that simultaneously contradicted Detective Domenech's testimony that she canvassed the crime scene looking for witnesses and supported the family members' testimony that they attempted to speak to the police. It was admissible under N.J.R.E. 607(a), which permits introduction of relevant extrinsic evidence "[f]or the purpose of attacking or supporting the credibility of a witness." The testimony of Detective Domenech and the family were in direct conflict. The on-scene video arguably resolved the conflict. The prosecutor dispelled any doubt about the relevance and importance of the withheld video when he urged the jury to reject the family members' testimony about their attempted cooperation. If the jury accepted the prosecutor's argument that the family members testified falsely about coming forward to the police, the jury was entitled to reject the entirety of their testimony, including their testimony that defendant acted in self-defense. (pp. 24-26)

2

2.  The video was admissible to rebut a charge of recent fabrication pursuant to N.J.R.E. 803(a).  The combination of the detective's testimony that no witnesses came forward at the scene and the prosecutor's finely crafted questions posed to defendant's family members -- eliciting answers that they met with defense counsel and each other before testifying and that their bonds of affection toward defendant made them want to help him -- inescapably suggested that they were fabricating their testimony or had an improper motive in testifying.  The contemporaneously recorded video of the contact between the family members and the police at the scene rebutted the implied charge, raised by the prosecutor's questions, of recent fabrication and improper motive.  (pp. 26-27)

3.  In his summation, the prosecutor attacked the credibility of defendant's family members, misrepresenting that they made no attempt to speak with the police at the scene.  The prosecutor specifically discredited the mother, arguing that the mother was aware she had to speak with the detective and not the police officers, that she saw Domenech taking notes, and that she did not respond the way a mother naturally would respond if she had helpful information concerning her son to "tell the police at the scene" about what had happened.  The excluded video refuted the image he conveyed to the jury.  The prosecutor exploited a favorable evidentiary ruling to strike an unfair blow at the defense and give a misleading presentation to the jury untethered to the truth.  (pp. 27-30)

4.  In fulfilling the duty to seek justice, a prosecutor must refrain from making inaccurate factual assertions to the jury and from employing improper methods calculated to produce a wrongful conviction.  Although the prosecutor is free to discuss the direct and inferential evidence presented at trial, the prosecutor cannot press an argument that is untrue -- that is contradicted by an objective video recording excluded from evidence for reasons unrelated to its authenticity.  That otherwise trustworthy and reliable evidence may be deemed inadmissible, for one reason or another, does not give a party, including the prosecutor, a right to freely portray a false picture of events.  (pp. 30-32)

5.  This case was a pitched credibility contest between the witnesses presented by the State and the defense.  The prosecutor's synthetic argument that defendant's family members, in essence, lied when they testified that they tried to speak with the police at the scene had the clear capacity to tip the scales against defendant.  For if the jury believed that argument, then it was within its rights to disregard the whole of their testimony supporting defendant's self-defense claim.  Under the plain error doctrine, the trial court's error in excluding the video from evidence and the prosecutor's improper exploitation of that evidentiary ruling combined to deny defendant a fair trial.  (pp. 32-34)

**REVERSED and REMANDED for a new trial.**

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, SOLOMON, and PIERRE-LOUIS join in JUSTICE ALBIN's opinion.**

3

SUPREME COURT OF NEW JERSEY
A-47 September Term 2019
083568

State of New Jersey,

Plaintiff-Respondent,

v.

Gabriel Garcia, a/k/a Gabriel H. Garcia, Gabriel H. Chiriboga,
Gabriel G. Chirboga, and Gabriel H. Garciachiriboga,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
| November 9, 2020 | March 10, 2021 |

Marcia Blum, Assistant Deputy Public Defender, argued
the cause for appellant (Joseph E. Krakora, Public
Defender, attorney; Marcia Blum, of counsel and on the
briefs).

Erin M. Campbell, Assistant Prosecutor, argued the cause
for respondent (Esther Suarez, Hudson County
Prosecutor, attorney; Stephanie Davis Elson, Assistant
Prosecutor, on the brief).

Karen Thompson argued the cause for amicus curiae
American Civil Liberties Union of New Jersey (American
Civil Liberties Union of New Jersey Foundation,
attorneys; Karen Thompson, Alexander Shalom, and
Jeanne LoCicero, on the brief).

1

Dillon J. McGuire argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (Pashman Stein Walder Hayden, attorneys; CJ Griffin, of counsel and on the brief, and Dillon J. McGuire, on the brief).

Deborah Bartolomey, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Gurbir S. Grewal, Attorney General, attorney; Deborah Bartolomey, of counsel and on the brief).

JUSTICE ALBIN delivered the opinion of the Court.

The trial of defendant Gabriel Garcia presented two diametrically different accounts of what happened on Sip Avenue in Jersey City on September 11, 2016. The State's witnesses claimed that Raymond Urbanski approached defendant about the honking of his car's horn, and defendant, without provocation, slashed his face with a knife. In contrast, the defense witnesses claimed that Urbanski and two other men -- all armed with weapons -- assaulted defendant for beeping the horn, and that defendant, as a last resort, defended himself with his work box cutter.

To rebut the prosecutor's implicit charge that the defense witnesses -- members of defendant's family -- fabricated their trial testimony, defendant sought to introduce a video showing that those witnesses attempted to give their account to police officers at the scene, only to be turned away and told to "take it to court." The trial court ruled that the video constituted inadmissible

2

hearsay. Without having to explain away the voices and images on the video that conflicted with his presentation, the prosecutor in his summation suggested that had the defense witnesses actually observed defendant act in self-defense, they would have approached the police and investigating detective at the scene.

The jury convicted defendant of second-degree aggravated assault and related offenses. The Appellate Division upheld defendant's convictions. The Appellate Division concluded that the trial court erred in finding the video inadmissible but that the error did not warrant the grant of a new trial. It found that the prosecutor's summation -- to which defense counsel offered no objection -- did not exceed the acceptable bounds of fair comment.

We now reverse. We agree with the Appellate Division that the trial court erroneously kept admissible evidence from the jury. The video rebutted what the prosecutor implied during cross-examination -- that defendant's witnesses lied about their attempt to speak and cooperate with the police at the scene. That video also contradicted the investigating detective's testimony that she had thoroughly canvassed the area for witnesses. In summation, the prosecutor exploited the suppression of the video to present a false narrative. The prosecutor improperly suggested to the jury that the defense witnesses made no effort to give their accounts to the police officers at the scene --

3

despite the excluded video's evidence to the contrary. On that unjustifiable basis, the prosecutor urged the jury to reject the defense witnesses' testimony as untrustworthy. That improper gamesmanship had the clear capacity to unfairly tip the scales in this pitched credibility contest.

Prosecutors are required to turn square corners because their overriding duty is to do justice. A misleading argument pressed even in the heat of the moment while zealously presenting closing remarks does not lessen the damage done to defendant's fair trial rights. We conclude that the combination of the trial court's erroneous evidentiary ruling and the prosecutor's inappropriate remarks during summation had the clear capacity to cause an unjust result.

We therefore reverse the judgment of the Appellate Division and remand for a new trial.

## I.

## A.

Defendant was charged in a Hudson County indictment with second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1); third-degree possession of a weapon with an unlawful purpose, N.J.S.A. 2C:39-4(d); and fourth-degree possession of a knife under circumstances not manifestly appropriate, N.J.S.A.

4

2C:39-5(d).[1]  During a four-day jury trial, the State and defense presented starkly different accounts of the events in dispute.  The one point neither side contests is that the bloody confrontation between defendant and Urbanski began with the beeping of a car horn as defendant waited in his BMW outside his mother's house to pick up his uncle.

1.

According to the testimony of Urbanski and his wife, Jennifer, on September 11, 2016, at around 1:00 a.m., defendant parked his BMW two doors from their home on Sip Avenue in Jersey City and began "blasting" his horn.  At that moment, Urbanski and Jennifer were outside saying good-bye to Jennifer's brother while their three children were asleep inside.  Urbanski gestured for defendant "to keep it down," but defendant may not have seen him, so he walked toward the car with his wife a few feet behind.  Defendant then exited his car and approached Urbanski with a box cutter in his hand.  The two started arguing loudly, and the confrontation escalated into a physical struggle on a nearby sidewalk.  Urbanski decided that he had "to get this knife from this guy," and then defendant raised the knife high and brought it down, slashing Urbanski's face and finger.

---

[1]  A fourth charge was dismissed before trial.

In shock and soaked in blood, Urbanski stated he ripped off his shirt and pressed it against his face, which Jennifer described as "sliced . . . wide open." Afterwards, defendant left the scene in his car. Jennifer recalled that her husband briefly passed out and when he regained consciousness he went up to defendant's mother's porch, where the mother and other family members had gathered, and a shouting match ensued. Urbanski remembered going to the porch with the thought that defendant was inside the house. Jennifer stated that she and her brother dragged Urbanski away by his t-shirt because he was "flipping out." Jennifer called the police.

Jersey City police officers arrived on the scene minutes later, and Urbanski and Jennifer gave a description of the attacker. Emergency medical services transported Urbanski to the hospital, where he received approximately twenty-six stitches to his face and treatment for nerve damage and a fracture to his pinky, which also required a skin graft.

Detective Janixza Domenech testified that when she arrived on the scene approximately ten police officers were already there -- some of whom were investigating the crime. Detective Domenech spoke briefly with Urbanski while he was receiving medical attention but took a formal statement only from Jennifer. The detective also took Jennifer to a nearby ambulance where she identified defendant as her husband's assailant. No investigating police

6

officer spoke with defendant, and Detective Domenech made no attempt to do so. Domenech stated that she canvassed the area for witnesses but found none other than Urbanski and Jennifer. The detective said she did not speak with any member of defendant's family, and, to her knowledge, no other witnesses came forward. When asked whether she knocked on doors looking for witnesses, Detective Domenech responded that she had a victim, and she had a witness who identified the perpetrator. To her mind, the case was "pretty cut and dry."

2.

The defense presented testimony from defendant as well as his mother, Migdalia Chirobaga; his stepfather, Jose Canales; his sister, Diana Freire; his uncle, Jorge Salgado; and a police officer friend, Jonathan Colon.

Defendant testified that around 12:00 a.m. on September 11, he went to his mother's house to pick up his uncle, aunt, and cousin, who were visiting from Venezuela. He planned to take them to his home to stay and from there to visit an indoor waterpark. When he parked near his mother's house on Sip Avenue, he honked his horn three times to announce his arrival. Urbanski approached his car uttering expletives about the beeping of the horn. When defendant explained that he was waiting for his uncle, Urbanski banged on his

7

car roof, saying words to the effect of, "don't make no F'ing noise around here."

Defendant exited his car, and Urbanski attempted to punch him. As defendant backed up, Urbanski and two other men began to chase him. All three men were armed -- Urbanski with a bottle, one with a stick, and another with a knife who stabbed the tires of defendant's car. Over the course of the confrontation, Urbanski punched defendant several times. Defendant ran towards his mother's house and told the men that he "didn't want any problems."

Aroused by the screaming outside, defendant's mother, stepfather, sister, and uncle came onto the porch. Their testimony generally paralleled defendant's account of the events that followed. As defendant was confronted by Urbanski and his armed companions, defendant's mother rushed in front of her son and pleaded with the men to stop, but one of them pushed her away.

Defendant carried a small box cutter on his belt that he used at work as a mechanic. He pulled the box cutter out after Urbanski had punched him and as the men continued to menace him. When one of the men struck defendant in the head with a bottle, defendant, in fear, flung out his hand that held the box cutter and slashed Urbanski's face. Defendant managed to escape and enter his car, and with the men banging on his car's windows, he "took off."

8

Afterwards, defendant's family retreated into the house, as Urbanski, in a rage, kicked and broke the front door and threatened to kill the family members inside.

Defendant drove up the block and parked, as blood streamed down his face onto his shirt. Defendant then contacted his friend from church, Jonathan Colon, an off-duty Jersey City police officer, and asked him to call the police. According to Colon's testimony, defendant "sounded like he was crying . . . [and] [v]ery scared." As defendant requested, Officer Colon called dispatch to send police units to the scene.

According to defendant, as soon as the police arrived in front of his mother's house, he returned and parked in front of a patrol car. Urbanski then approached his car and began punching him through the window -- an act also witnessed by defendant's family members. A police officer pulled Urbanski away, and defendant was taken from his car and arrested. When he attempted to explain what had happened, he was told to "shut up." Defendant was placed in an ambulance and eventually transported to a hospital where he was treated for a head injury requiring a number of staples.

Defendant's mother, stepfather, and sister each testified that they attempted to speak with the police at the scene but that "they just wouldn't listen." Each gave an account of police indifference to listening to their side

9

of the story. The sister stated, "[n]obody came up to us. Not one detective came up to us. Not one of them heard our story," and when the family members tried to speak up, they were told "to back up, back off." The mother explained that they tried to tell the police officers what had happened but were told "you have to say that at court." The mother stated that she saw nearby a female detective in civilian clothes with a notebook, who "never asked us anything." The family members recalled that Detective Domenech made no attempt to interview them, and when they tried to approach, defendant's mother said, "the police pushed us away." When asked whether he tried to tell the police what happened, the stepfather replied, "[w]e tried a number of times. Two or three times, but they ignored us. Simple. They simply ignored us."

During the cross-examination of defendant's mother, stepfather, and sister, the prosecutor elicited generally the same basic responses from the witnesses: they spoke to the defense attorney and among themselves before appearing in court, and they hoped their testimony would be helpful to defendant.

### 3.

At the start of the second day of testimony, defense counsel notified the court and prosecutor of a video taken by the uncle capturing the family's

interaction with the police at the scene.  Defendant sought to admit the video.

Later that day, after defendant's mother and stepfather had testified, the court

conducted a Rule 104 hearing[2] out of the presence of the jury.  At the hearing,

the uncle testified and the video was played.

The video revealed, in relevant part, the following exchange between the

family members and the police:

> Police officer:  What happened -- . . . that's for court.
> That's not for now.
>
> . . . .
>
> Stepfather:  Okay.  Excuse me.  What happened this
> guy.  He -- he come and say me killing me, that that
> shorter guy over there he got a knife --
>
> Police officer:  You didn't call the cops.  Did you call
> the cops?
>
> Stepfather:  Yeah.  My daughter called the cop.
>
> Mother:  We call the cops.
>
> Police officer:  No, you didn't.
>
> Mother:  Yes, we did.
>
> Stepfather:  Yeah, yeah.
>
> Mother:  We called the cops.

---

[2]  N.J.R.E. 104(a) provides that a court "shall decide any preliminary question about whether . . . evidence is admissible" and "may hear and determine such matters out of the presence or hearing of the jury."

11

. . . .

> Stepfather: I -- I got a record for the calling . . . . I got a video of this guy saying he's killing (indiscernible).

> Police officer: Okay. You take that to court. Take that to court when you go to court. When you go to court you take it to court.

> . . . .

> Stepfather: This guy -- this guy no coming, (indiscernible) --

> Police officer: Take it to court.

> Stepfather: [Killing] everybody in the house.

> Police officer: Take it to court. Okay?

The court ruled that the video was inadmissible hearsay offered to bolster the testimony of the defense witnesses. The court specifically rejected the argument that the statements captured on the video were prior consistent statements admissible to meet a charge of recent fabrication, improper influence, or improper motive under N.J.R.E. 803(a)(2). Indeed, the court found that the prosecutor did not suggest, in cross-examining the defense witnesses, that they recently fabricated their testimony or that their testimony was based on an improper influence or motive.

12

The prosecutor's summation targeted the credibility of defendant's family members, urging the jury to disbelieve their testimony because they did not come forward and give their accounts to Detective Domenech or the police officers at the scene. The prosecutor also intimated that it was preposterous to think that the police would not take information from an available witness. The prosecutor argued:

> And then, again, the family's all outside and -- and they're supposedly out there and nobody cares what they have to say. And his mother testifies and there was an important little part of that testimony that I want to emphasize to you that I think is relevant to figure out what happened here, that the mother knew the difference between a police officer and a detective. She knew that police officers don't have the same role, that they get there and they help secure a scene, they do this and that. But the detectives, the detectives are the people who investigate, who take the witness statements, who try to get the picture here. And she described the person, who's Detective Domenech, who came here and told you nobody approached her, nobody approached her, nobody from the Garcia family as he would have you believe approached her.
>
> Despite the fact that she was clearly a detective she's walking around with the notebook, she's taking notes, she's talking to the Urbanskis, she's trying to figure out what happened. And knowing this they still (indiscernible) and talk to her. <u>If this really happened like that, you running out there for your son, you're going to tell the people, the police at the scene, the detectives at the scene, those charged with this investigation that, no, this -- there's something else</u>

going on here. But she never did, she never did. And that should rule large in your mind.

Another thing [our] common sense tells us, police don't ignore witnesses who have material information. . . . When people have information about a crime, about an attack, about anything like that, they want (indiscernible) people have to say. They don't ignore people. And they certainly don't ignore defendants who want to talk.

[(emphases added).]

Defense counsel raised no objection to those remarks.

B.

The jury returned a guilty verdict on all three charges. The court sentenced defendant on the second-degree aggravated assault conviction to a seven-year term with an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2, and on the third-degree possession of a weapon with an unlawful purpose conviction to a concurrent three-year term. The fourth-degree weapons possession conviction was merged into the third-degree weapons conviction.

14

## C.

In an unpublished, per curiam opinion, the Appellate Division affirmed defendant's convictions.[3] The Appellate Division, however, disagreed with the trial court's ruling that the video was hearsay and instead found that the video was offered "to rebut Domenech's testimony that no one from [defendant's] family came forward to discuss the incident." In its view, the statements in the video were offered not for their truthfulness but only to show that they were made. Nevertheless, the Appellate Division concluded that the trial court did not abuse its discretion "based on the information presented to the [court]." It determined that the exclusion of the video did not deprive defendant of a fair trial because it had no bearing on "whether defendant acted in self-defense when he stabbed Raymond" and because "[i]t showed defendant's family fleetingly speaking with police officers, not the detective."

The Appellate Division also held that, in his summation, the prosecutor did not act unreasonably in impeaching the defendant's mother's credibility for failing to approach Detective Domenech at the scene with the account favorable to her son that she presented at trial. The court emphasized that the video "showed family members interacting with police officers," not with

---

[3] We do not discuss issues raised before the Appellate Division that are not germane to the appeal before us.

15

Detective Domenech, and that defendant's mother knew that Domenech was leading the investigation because the detective was carrying a notebook. In the end, the Appellate Division concluded that the prosecutor's remarks, including those attacking the mother's credibility, were a fair commentary on the evidence and a fair response to defense counsel's "summation that the police investigation was one-sided."

D.

This Court granted defendant's petition for certification, limited to the issues of whether "the exclusion of the cell phone video" and the prosecutor's summation remarks denied defendant a fair trial. 241 N.J. 15 (2020). We also granted the motions of the American Civil Liberties Union of New Jersey (ACLU), the Association of Criminal Defense Lawyers of New Jersey (ACDL), and the New Jersey Attorney General to participate as amici curiae.

II.

A.

1.

Defendant argues that the video of defendant's family members attempting to give their account to the police at the scene -- an account that would have portrayed defendant as a victim who acted in self-defense -- was admissible on two separate grounds. First, the events and statements captured

16

on the video were not hearsay because they were offered not to prove the truth of any "matter asserted" but rather to "disprove[] the detective's assertion that no one from [defendant's] family came forward at the scene." Defendant asserts that the contemporaneously recorded video evidence "carried infinitely greater credibility and impact than their testimony" in refuting Domenech's testimony.

Second, defendant contends that the video-recorded evidence was admissible under N.J.R.E. 803(a)(2) to rebut an implied charge of recent fabrication. Detective Domenech's trial testimony that defendant's parents did not "come forward" implied that the parents lied when they testified that they attempted to give their account to the police at the scene. The on-scene video of the family's attempt to speak with the police, defendant submits, was relevant to prove that his parents' testimony was not a recent fabrication but indeed the truth.

Defendant also claims that the prosecutor in his summation "took unconscionable advantage of the exclusion of the video to mislead the jury and undermine [defendant's] self-defense claim." Defendant maintains that the prosecutor misrepresented to the jury that defendant's family members made no effort to speak with the police, even though the prosecutor "knew that the excluded cellphone video supported" the testimony of defendant's parents. He

17

contends that the prosecutor's misrepresentations "create[d] the false impression that [defendant's] parents did not testify truthfully," thus fatally undermining his defense and denying him a fair trial. Defendant urges the reversal of his conviction because "critical defense evidence was wrongly excluded" and because "the prosecutor capitalized on the [video's] exclusion to mislead the jury."

2.

Amici, the ACDL and ACLU, echo defendant's arguments that he was denied a fair trial. The ACDL emphasizes that the prosecutor knew that "the jury would reasonably expect the family to speak with police if [d]efendant had in fact acted in self-defense" and knew that the jury would never see the video showing the family members speaking with the police. Nevertheless, the prosecutor falsely asserted that no family member spoke with the police and implored the jurors to let that point "rule large" in their minds. Those knowing factual misrepresentations, the ACLU posits, "corrupted the truth-seeking function the prosecutor is tasked with upholding" and rendered defendant's conviction "fundamentally unjust."

B.

1.

The State counters that the trial court properly excluded the video on the basis that it contained "inadmissible hearsay" and was "needlessly cumulative."[4] The State contends that defendant offered the video for the impermissible purpose of bolstering the testimony of his witnesses and that the video "had no bearing on whether [defendant] acted in self-defense" because it did not capture the events surrounding the slashing of Urbanski. The State also maintains that the video was not admissible under N.J.R.E. 803(a)(2) because the prosecutor did not argue that defendant's witnesses fabricated their testimony and therefore the defense had no charge of fabrication to rebut.

The State, moreover, submits that the prosecutor's summation was nothing more than fair commentary on the evidence and an appropriate response to defendant's self-defense claim. The State deflects defendant's argument that the prosecutor falsely asserted that "[defendant's] family had not tried to speak to police," explaining that defendant "uses the term 'police' too

---

[4] The State's claim that the court excluded the video on the ground that it was not "properly authenticated" is not supported by the record. Neither the trial court nor the Appellate Division found a lack of authentication of the video. Defendant's uncle testified through a Spanish interpreter that he took the video. That the voices on the video are in English did not diminish the uncle's ability to vouch for the authenticity of the video.

19

generally" and that defendant's mother knew the difference between a police officer and a detective and yet "did not approach the detective at any point during the investigation" to claim that her son was "attacked by a mob of armed men." The State emphasizes that defendant did not object to the prosecution's summation remarks and that, in any event, those remarks were not clearly and unmistakably improper and did not have the capacity to deny him a fair trial.

2.

Amicus, the Attorney General, repeats many of the same arguments advanced by the State: the video was (1) inadmissible hearsay offered to bolster the testimony of the defense witnesses; (2) irrelevant because it did not refute the detective's testimony; (3) "ancillary" because it did not speak to the occurrence of the stabbing or support the claim of self-defense; and (4) "cumulative" because it was repetitive of the defense testimony. In the Attorney General's view, "[t]he video was not critical evidence for the defense." Last, the Attorney General submits that the prosecutor's summation did not exploit the exclusion of the video but rather made fair comment on the evidence.

III.

A.

The witnesses for the State and defense presented starkly different accounts of what occurred in the early morning hours on Sip Avenue -- and the outcome of the case largely depended on the jury's assessment of the credibility of those witnesses. The jury had to decide whether defendant, when confronted by Urbanski for honking his horn, exited his car, pulled a knife, and then during the ensuing argument slashed Urbanski. Or whether an enraged Urbanski and other armed companions pursued defendant, surrounded him in front of his mother's house, punched him, and struck him in the head with a bottle, leading defendant to slash Urbanski in self-defense.

Defendant's mother, stepfather, and sister all testified to witnessing a violent attack on defendant and his attempt to defend himself. Whether the jury accepted that account depended on the credibility of those witnesses -- and the prosecutor unsurprisingly sought to impair their credibility.

Detective Domenech testified that she canvassed the area for witnesses, which presumably included the vicinity of the mother's porch where the events occurred, and found no witnesses other than Urbanski and his wife, Jennifer. In contrast to Detective Domenech's testimony, defendant's family members testified that, outside their home, they attempted to convey to the police their

21

side of what happened only to be pushed away and told to say it in court. Thus, the credibility of the detective and the family members was also at issue.

In cross-examining the family-member witnesses, the prosecutor elicited that, before testifying, they all had spoken with the defense attorney, they all had conversed with each other about the events, and they all had sufficient affection for defendant that they would do what they could to help him. That line of questioning is not unusual and certainly not nefarious, but it suggests that the witnesses coordinated their testimony with defendant's attorney and among themselves, and that they might have a motive to bend the truth for a beloved family member.

Within that context, we must determine whether the trial court erred in barring the admission of the video recording taken by defendant's uncle at the scene -- a recording that showed the family members attempting to speak with police officers about what they had witnessed and that depicted a plainclothes female officer (evidently Detective Domenech) carrying a notepad walking only a few feet away from them.[5]

We defer to a trial court's evidentiary ruling absent an abuse of discretion. State v. Nantambu, 221 N.J. 390, 402 (2015). We will not

---

[5] Defendant's mother testified that she saw a female detective carrying a notebook at the scene. The prosecutor in his summation accepted that the

22

substitute our judgment unless the evidentiary ruling is "so wide of the mark" that it constitutes "a clear error in judgment." See State v. Medina, 242 N.J. 397, 412 (2020) (first quoting State v. Brown, 170 N.J. 138, 147 (2001); and then quoting State v. Scott, 229 N.J. 469, 479 (2017)). Every mistaken evidentiary ruling, however, will not lead to a reversal of a conviction. Only those that have the clear capacity to cause an unjust result will do so. See State v. Prall, 231 N.J. 567, 581 (2018); see also R. 2:10-2.

### B.

Defense counsel learned of the existence of the video the evening after the first day of trial testimony and brought it to the attention of the prosecutor and court the next morning. Defense counsel stated that the video would corroborate his witnesses. Although defendant and his sister had already testified, his mother, stepfather, and uncle had yet to do so. The court withheld a decision on the admissibility of the video until after those family members were called to the stand. After they testified, defense counsel offered the admission of the video "to support my client and my witnesses," without citing to a specific evidentiary rule as authority. Noting that the request to admit the video was untimely, the court nevertheless addressed the merits of

---

mother's testimony identified Detective Domenech.

23

the video's admissibility and determined that the video did not constitute a prior consistent statement to meet a charge of recent fabrication, N.J.R.E. 803(a)(2). Specifically, the court found that the prosecutor's cross-examination did not give rise to a suggestion of "recent fabrication or improper influence or motive" and that the video would improperly bolster the testimony of the family witnesses.

To be sure, defense counsel did not artfully present the case for the admissibility of the video, and we do not excuse the failure of defense counsel to cite specific rules of evidence to support her position. Nonetheless, two clear grounds justified the admission of that critical evidence.

First, the video recording constituted extrinsic evidence that simultaneously contradicted Detective Domenech's testimony that she canvassed the crime scene looking for witnesses and supported the family members' testimony that they attempted to speak to the police. N.J.R.E. 607 provides, in relevant part, that "[f]or the purpose of attacking or supporting the credibility of a witness, any party including the party calling the witness may examine the witness and introduce extrinsic evidence relevant to the issue of credibility." N.J.R.E. 607(a) (emphasis added). The video recording was relevant evidence -- "evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E.

24

401; see also State v. Timmendequas, 161 N.J. 515, 596 (1999) (noting that extrinsic evidence proving "that material facts are other than as testified to by the witness under attack" is "essential" for the jury's credibility determinations). The testimony of Detective Domenech and the family were in direct conflict. The on-scene video -- seemingly unimpeachable extrinsic evidence -- arguably resolved the conflict. The prosecutor, moreover, dispelled any doubt about the relevance and importance of the withheld video when, based on Detective Domenech's testimony, he urged the jury to reject the family members' testimony, particularly the mother's, because they failed to come forward at the scene.

The power of a video of contemporaneously recorded events at the crime scene can hardly be disputed. Indeed, it "enhance[s] a judge or juror's assessment of credibility by providing a more complete picture of what occurred." State v. Cole, 229 N.J. 430, 450-51 (2017) (alteration in original) (quoting State v. Cook, 179 N.J. 533, 556 (2004)). The video's importance in this case cannot be underestimated. If the jury accepted the prosecutor's argument that the family members testified falsely about coming forward to the police at the scene, the jury was entitled to reject the entirety of their

25

testimony, including their testimony that defendant acted in self-defense. Indeed, the court charged the jury on the "false in one, false in all" doctrine.[6]

Second, the video was admissible, as an exception to the hearsay rule, to rebut a charge of recent fabrication. N.J.R.E. 803(a) provides that a statement is not subject to the hearsay rule if "[t]he declarant-witness testifies and is subject to cross-examination about a prior otherwise admissible statement, and the statement: . . . (2) is consistent with the declarant-witness' testimony and is offered to rebut an express or implied charge against the declarant-witness of (A) recent fabrication or (B) improper influence or motive." Accord N.J.R.E. 607(b) ("A prior consistent statement shall not be admitted to support the credibility of a witness except: (1) to rebut an express or implied charge against the witness of recent fabrication or of improper influence or motive, and (2) as otherwise provided by the law of evidence." (emphasis added)).

The combination of Detective Domenech's testimony that no witnesses came forward at the scene and the prosecutor's finely crafted questions posed

---

[6] The trial court instructed the jury that "[e]vidence has been presented showing that at a prior time a witness or perhaps witnesses said something or failed to say something which is inconsistent with the witness's testimony at the trial. . . . [I]f you believe that any witness or party willfully or knowingly testified falsely to any material facts in the case with intent to deceive you, you may give such weight to [his] or her testimony as you may deem is entitled. You may believe some of it or you may in your discretion disregard all of it."

26

to defendant's family members -- eliciting answers that they met with defense counsel and each other before testifying and that their bonds of affection toward defendant made them want to help him -- inescapably suggested that they were fabricating their testimony or had an improper motive in testifying. That line of prosecutorial questioning, however permissible, had no other purpose than to intimate that the family members' testimony was untruthful. For that reason, the contemporaneously recorded video of the contact between the family members and the police at the scene rebutted the implied charge, raised by the prosecutor's questions, of recent fabrication and improper motive.

## IV.

### A.

With the video excluded and without the constraint of the images and voices on the video played before the jury, the prosecutor launched a damning attack in his summation on the credibility of defendant's family members, misrepresenting that they made no attempt to speak with the police at the scene. The prosecutor characterized the notion that the police disregarded defendant's family as utterly incredible:

> And then, again, the family's outside and -- and they're <u>supposedly</u> out there and <u>nobody cares what they have to say</u>.

27

Another thing [our] common sense tells us, <u>police don't ignore witnesses who have material information</u>. . . . When people have information about a crime, about an attack, about anything like that, they want (indiscernible) people have to say. <u>They don't ignore people.</u>

[(emphases added)].

Yet, the video showed that the family members attempted to provide information to the uniformed officers, only to be told repeatedly: "You take that to court."; "Take it to court."; "Take it to court."

The prosecutor specifically discredited the mother by imputing to her a first-hand knowledge of the police chain of command, an understanding that "detectives are the people who investigate, who take the witness statements." From that premise, the prosecutor argued that the mother was aware she had to speak with the detective and not the police officers. But Detective Domenech made no such distinction in her testimony. Domenech stated that some of the police officers were also investigating the crime scene. And defendant's family was imploring the police officers to listen.

The prosecutor indicated that the mother saw Domenech "walking around with a notebook . . . taking notes." And that is one of the striking images on the video not seen by the jury: a plainclothes woman walking around with a notebook, just feet from the family members whose way was blocked by the uniformed officers. The video -- had it been seen by the jury --

28

would have stood as an unimpeachable refutation of Detective Domenech's testimony that she was canvassing the area for witnesses.

The prosecutor, moreover, sought to sow disbelief in the mother's testimony based on the natural maternal instinct to come to the defense of a child at the first opportunity -- and falsely argued nothing of that nature occurred at the scene:

> If this really happened like that, <u>you running out there for your son, you're going to tell the people, the police at the scene, the detectives at the scene, those charged with this investigation</u> that, no, this -- there's something else going on here. But she never did, she never did. And that should rule large in your mind.
>
> [(emphasis added.)]

Remarkably, the prosecutor advanced an argument he knew to be untrue -- an argument intended to devastate the mother's credibility -- even though the excluded video he reviewed that very day refuted the image he conveyed to the jury. He drove home that falsehood by urging the jury to remember that defendant's mother did not respond the way a mother naturally would respond if she had information that would spare her son from a wrongful arrest: she did not attempt to "tell the police at the scene" what had happened. That point, the prosecutor emphasized, "should rule large in your mind."

The prosecutor exploited a favorable evidentiary ruling -- the exclusion of the video -- to strike an unfair blow at the defense. Unburdened by having

29

to explain the images and voices on the video, the prosecutor then gave a misleading presentation to the jury untethered to the truth.

That the prosecutor's remarks may have been the product of the surprise production of the video that morning coupled with overzealous advocacy in which he was carried by the current of the moment cannot excuse the purposeful presentation of a fiction to the jury.

B.

In representing the State in a criminal action, the prosecutor is endowed with a solemn duty -- "to seek justice, not merely to convict." State v. Williams, 113 N.J. 393, 447 (1988) (quoting ABA Standards Relating to the Administration of Criminal Justice, Standard 3-1.1(c) (2d ed. 1980)). In fulfilling that duty, a prosecutor must refrain from making inaccurate factual assertions to the jury, State v. Smith, 167 N.J. 158, 178 (2001), and from employing "improper methods calculated to produce a wrongful conviction," State v. Ramseur, 106 N.J. 123, 320 (1987) (quoting State v. Farrell, 61 N.J. 99, 105 (1972)). To be sure, prosecutors are given wide latitude in making their summations and may sum up "graphically and forcefully." State v. Johnson, 31 N.J. 489, 510 (1960); see also Williams, 113 N.J. at 447. We are also mindful of the "charged atmosphere" of a trial that summons the competitive instincts of the advocates. Ramseur, 106 N.J. at 320 (quoting

30

State v. Bucanis, 26 N.J. 45, 56 (1958)). But a trial is not a gladiatorial contest; it is a forum where justice must be done. In that forum, prosecutors must "stay within the orbit of strict propriety" and adhere to the high ethical standards of their office. Ibid. (quoting Bucanis, 26 N.J. at 56).

Although the prosecutor is free to discuss the direct and inferential evidence presented at trial, the prosecutor cannot press an argument that is untrue -- that is contradicted by an objective video recording excluded from evidence for reasons unrelated to its authenticity. That otherwise trustworthy and reliable evidence may be deemed inadmissible, for one reason or another, does not give a party, including the prosecutor, a right to freely portray a false picture of events. Cf. State v. Francis, 191 N.J. 571, 594 (2007).

In this case, in the technical sense, the prosecutor may have limited his remarks to the evidence of record, but in the fullest sense, he pursued a course that he knew was not consistent with the truth. Our system of justice places checks on the propagation of falsehood. An object or a video excluded from evidence does not become imaginary or non-existent. For example, a gun suppressed because of a Fourth Amendment violation does not allow a defendant to take the stand and lie -- without contradiction -- that he never possessed the gun when a video reveals that he did. Cf. State v. Burris, 145 N.J. 509, 532-34 (1996) (noting that, to "ensur[e] truth in the justice system," a

31

defendant's in-court testimony may be impeached by trustworthy out-of-court statements made by defendant but excluded for Miranda violations).  Even in our adversarial system, the notion that a trial is a search for truth is not an empty anachronism.

Every prosecutorial misstep will not warrant a new trial.  In this case, as in others, we must measure the prejudicial effect of the prosecutorial excesses against a defendant's fair trial rights.  State v. McNeil-Thomas, 238 N.J. 256, 275 (2019).  Only when the prosecutor's conduct in summation so "substantially prejudice[s] the defendant's fundamental right to have the jury fairly evaluate the merits of his defense" must a court reverse a conviction and grant a new trial.  Bucanis, 26 N.J. at 56; see also McNeil-Thomas, 238 N.J. at 276 ("Prosecutorial comments are deemed to have violated the defendant's right to a fair trial when they 'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.'"  (alteration in original) (quoting State v. Jackson, 211 N.J. 394, 409 (2012))).

V.

Defendant did not clearly articulate to the trial court the grounds for the admission of the video and did not raise an objection to the prosecutor's summation remarks.  We consider the trial court's error in excluding the video from evidence and the prosecutor's improper exploitation of that evidentiary

ruling cumulatively under the plain error doctrine. See R. 2:10-2. Under that doctrine, an appellate court should disregard errors unless they are "clearly capable of producing an unjust result." Ibid. "This is a 'high bar,' requiring reversal only where the possibility of an injustice is 'real' and 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Trinidad, 241 N.J. 425, 445 (2020) (first quoting State v. Santamaria, 236 N.J. 390, 404 (2019); and then quoting State v. Macon, 57 N.J. 325, 336 (1971)).

We conclude that the manifest errors committed in this case have vaulted that high bar and combined to deny defendant a fair trial. This case was a pitched credibility contest between the witnesses presented by the State and the defense. The jury had to determine whether defendant or Raymond Urbanski was the aggressor and whether defendant acted in self-defense. Although the prosecutor had a right to attempt to discredit the defense witnesses, he did not have a license to do so by unfair means. The prosecutor's synthetic argument that defendant's family members, in essence, lied when they testified that they tried to speak with the police at the scene had the clear capacity to tip the scales against defendant. For if the jury believed that the family members lied about their attempt to cooperate at the scene, then

the jury was within its rights to disregard the whole of their testimony supporting defendant's self-defense claim.

The errors here undermined the fundamental fairness of the trial and are "sufficient to raise a reasonable doubt as to whether [they] led the jury to a result it otherwise might not have reached." See ibid. (quoting Macon, 57 N.J. at 336).

## VI.

For the reasons expressed, we reverse the judgment of the Appellate Division and grant defendant a new trial. We remand to the trial court for proceedings consistent with this opinion.

CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, SOLOMON, and PIERRE-LOUIS join in JUSTICE ALBIN's opinion.